IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATE OF AMERICA ex rel. RITA HAYWARD | : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO._____ |
| Vs. | : : | Filed In Camera and Under Seal, Pursuant to the False |
| SAVA SENIOR CARE, INC. | : : : | Claims Act, 31 U.S.C. §3729 et seq. |
| | : : | |
| And | : : | |
| SSC LEBANON OPERATING COMPANY LLC, d/b/a LEBANON HEALTH AND REHABILITATION CENTER | : : : : : : : : | |
| | : : | |
| And | : : | |
| NICHOLE MCCALEB, | : : | |
| Defendants | : : : | |

**CIVIL COMPLAINT, FILED UNDER SEAL PURSUANT TO
THE FALSE CLAIMS ACT, 31 U.S.C. §3729 ET SEQ.**

Plaintiff ex rel. Rita Hayward, by and through her attorneys, files this Complaint, under

seal and in camera, pursuant to The False Claims Act, 31 U.S.C. §3729 et seq., and avers as

follows:

**<u>INTRODUCTION</u>**

1.      Defendants Sava Senior Care, Inc. ("Sava"), SSC Lebanon Operating Company

1

LLC, d/b/a Lebanon Health and Rehabilitation Center ("Lebanon Health"), and Nichole

McCaleb, violate federal laws and regulations by submitting false and fraudulent claims for

payment, under the Medicare program.   These claims are fraudulent because they falsely certify

that patients are in need of skilled nursing services, when in fact such services are not warranted.

Such services are extended to the maximum allowable length of stay, despite the lack of need for

skilled nursing services, for the sole purpose of increasing billings and income to defendants

Sava, Lebanon Health, and McCaleb.  Defendants also waive the co-pay requirements of

Medicare patients only, in violation of the Anti-Kickback Statute.  These waivers are given to

encourage the patients to continue their stays at defendants' facilities.

   2. The violations arise out of thousands of false claims for payment made to

Medicare, Medicaid, TRICARE and other federally funded government healthcare programs

(hereinafter, collectively referred to as "Government Healthcare Programs").

**I.** **<u>JURISDICTION AND VENUE</u>**

   3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1345;

and 31 U.S.C. §3729 et seq.

   4. Venue is proper in this District under 28 U.S.C. §§1391(b) and (c); and 31 U.S.C.

§3729 et seq.

   5. The facts and circumstances, which give rise to Defendants' violations of the

False Claims Act, have not been publicly disclosed in a federal criminal, civil, or administrative

hearing in which the Government or its agent is  a party;  nor in any congressional, Government

Accountability Office or other federal report, hearing, audit, or investigation, nor in the news

media.  Relator is the original source of the information upon which this complaint is based, as

2

that phrase is used in the False Claims Act and other laws at issue herein. Relator provided

disclosure of the allegations of her complaint to the United States prior to filing.

## II.   PARTIES

### A.   The Plaintiffs

6.      The United States of America is the real party in interest to the claims advanced

in Count I.

7.      Rita Hayward is a licensed professional counselor/ mental health service provider

("LPC/MHSP"), and a resident of Tennessee.  From February 28, 2009, through April 22, 2010,

Ms. Hayward was an employee of Lebanon Health and Rehabilitation Center, d/b/a SCC

Lebanon Operating Company LLC, located at 731 Castle Heights Court, Lebanon, TN 37087.

Ms. Hayward worked at Lebanon Health as Director of Social Services, and was a discharge

planner for the rehabilitation patients who received care at Lebanon Health.

### B.   The Defendants

8.      Defendant Sava is a corporation in the business of managing skilled nursing

facilities ("SNFs").  Defendant Sava's corporate headquarters are located at 1 Ravinia Drive #

1500, Atlanta, GA 30346-2115.   Formerly a subsidiary of Mariner Healthcare, Sava provides

long-term and short-term care at nursing and assisted living facilities. Through affiliated

facilities, the company provides skilled nursing, cancer and hospice care, physical, occupational

and speech therapies, Alzheimer and dementia programs, and many other services for elderly

patients.   As of 2008, Sava had almost 23,000 beds for nursing home patients in 190 facilities, in

19  states.

9.      Defendant Lebanon Health is a health facility in Lebanon, Tennessee, operating

3

as a skilled nursing facility, offering short-term health and rehabilitation services to patients post hospitalization. The services offered include rehabilitation post surgery and post accident, including physical and occupational therapies.

10.     Nichole McCaleb, (hereinafter, "defendant McCaleb") is the Nursing Home Administrator of defendant Sava's facility, defendant Lebanon. Defendant McCaleb has held this position since, upon information and belief, 2007.

### III.     THE FALSE CLAIMS AT ISSUE

11.     The false claims at issue in this case involve the coding of, and submissions for payment and approval of, claims for service that are not medically necessary because the beneficiaries do not have the need for skilled nursing or medical services. This practice constitutes upcoding, or the fraudulent practice in which provider services are billed for higher CPT procedure codes than were actually performed or are required. These fraudulent codes are then submitted for payment to Government healthcare programs.

12.     The false claims also arise out of services that are in violation of the Anti-Kickback Statute, in that the defendants waive copayments in exchange for enticing patients to extend their stays at defendants' facility.

13.     The Medicare program, established in 1965 by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et. seq.,* consists of two parts. <u>Medicare Part A</u> authorizes the payment of federal funds for hospitalization and post-hospitalization care, including care in skilled nursing facilities (nursing homes) and long-term care facilities. <u>Medicare Part B</u> authorizes the payment of federal funds for medical and other health services, including without limitation physician services, laboratory services, and outpatient therapy. These payments are fixed by the Medicare

4

Fee Schedule ("MFS").

Under the authority of the Social Security Act, the Secretary of HHS administers the Medicare Program through Centers of Medicare and Medicaid Services (CMS). CMS contracts with private insurance companies to administer the processing of claims. Part A reimbursement is processed through Fiscal Intermediaries ("FIs"). Part B reimbursement is processed through Medicare Carriers ("Carriers").

14.     Medicare enters into provider agreements with providers and suppliers to establish eligibility to participate in the Medicare Program. In order to be eligible for payment under the program, providers and suppliers must submit applications, and be accepted by the programs as participating providers. Participating providers must certify their understanding that payment of claims are conditioned on the claim and the underlying transaction complying with applicable laws, regulations and program instructions (including the Anti-Kickback Statute and the Stark laws).

15.     The Balanced Budget Act of 1997 changed SNF reimbursement for patients covered under Medicare Part A to a prospective payment system ("PPS"), beginning with the first cost reporting period on or after July 1, 1998. Under PPS, skilled nursing facilities are paid a fixed *per diem* amount for each Medicare Part A patient, which covers the routine, ancillary, and capital-related costs associated with that patient's stay, including non-physician services. The nursing home is responsible for paying for virtually all patient care services, including physical and occupational therapy services, out of this Part A per diem payment. This relationship is known as "billing under arrangement" and requires a contractual agreement between the nursing home and its non-physician suppliers or providers. 42 C.F.R. §482.75

5

(h)(2).

16.     The *per diem* amount depends on the severity of the patient's condition, classified according to resource utilization groups (RUGs).  The current version of RUG classifications is RUG III.   Generally, the PPS per diem rate for each RUG group is established based on Medicare payments for allowable SNF costs under Part A and Part B during applicable cost reporting periods beginning in fiscal year 1995, adjusted by market-based index amounts (accounting for cost increases between cost reporting periods) and case-mix and area-wage level index amounts.  *See* 42 C.F.R. §§ 413.330, 413.337.   Nursing homes must report the length of patient stays, and  payments made to providers under Part A, in the nursing homes' annual cost reports to the government.  42 C.F.R. §413.330.  From these cost reports, RUG rates are set for each facility.

17.     Under the Medicare Program, CMS also makes payments retrospectively (after the services are rendered) to SNF's for the services provided.  In order to receive payment, SNF's must submit claims for its Part A patients to its fiscal intermediary on CMS Claim Form 1450 (also called a UB-92).  At the end of its annual cost reporting period, SNF's must submit a cost report detailing the expenses and revenues for their facility along with the patient activity. This annual cost report is the final claim and is submitted on CMS Form 2540-96 (unless the facility qualifies for a simplified cost report on Form 2540s).   Annual cost reports constitute the final accounting of the facilities' federal program reimbursement.   Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare.  The cost report is also used as a part of the calculation of the reimbursement rates for

6

a health care facility in the next fiscal year. 42 C.F.R. §413.337 (a). As a condition of payment, the SNF must certify in its annual cost report that all data is accurately and truthfully reported and that it has complied with all applicable laws and regulations.

18.     The annual cost report is a factor in the consideration of reimbursement for a particular health care facility, during the next fiscal year. If a cost report shows a higher than expected cost for running the facility, due to any number of factors (including length of patient stay), the facility's RUGs are adjusted accordingly for the next applicable fiscal year. Conversely, if a facility were to report lower than anticipated costs for a particular cost report, the facility's RUGs would be adjusted downward, for the next applicable fiscal year. It is expected that facilities accurately report costs on the cost report, so that these actual costs can be used, among other things, to calculate future RUG payments. CMS also uses the data submitted on the cost reports to support management of the federal programs, including the development of cost limits and rates applicable to providers and suppliers.

19.     Post hospitalization SNF care is covered by Medicare Part A only when the beneficiary meets the level of "skilled services" requirements necessary for an SNF, and only for the days when such level of care is actually provided. "Skilled services" are those that, on a practical basis, can only be provided in an SNF on an inpatient basis. 42 C.F.R. §409.30-1.

20.     To be considered a skilled service, the service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel. 42 C.F.R. §409.32. To meet the daily basis requirement, the skilled nursing services or skilled rehabilitation services must be needed and provided 7 days a week. 42 C.F.R. §409.34. In

7

making a decision that a patient needs skilled nursing services, consideration must be given to the patient's condition and to the availability and feasibility of using more economical alternative facilities and services. 42 C.F.R. §409.35.

21.     Once a patient no longer has a need for skilled nursing or rehabilitation services, they must be discharged from the SNF. 42 C.F.R. §409.60.

22.     Medicare pays for up to one hundred (100) days of post-hospital SNF care furnished by an SNF after discharge from a hospital.    For the first 20 days,   Medicare pays for all covered services.    For the 21st through 100th day, Medicare pays for all covered services except for a daily coinsurance amount that is the beneficiary's  obligation. See, e.g., 42 C.F.R. § 409.85; 42 C.F.R. §409.61(b).

23.     For some beneficiaries who are dual eligible, that is, covered by both Medicare and Medicaid,  Medicaid covers the cost of the daily coinsurance amount on days 21 through 100. 42 C.F.R. §409.60.  The beneficiary's full entitlement to the 100 SNF benefit days is renewed each time he or she begins a benefit period.

24.     For patients who are on a Medicare Managed Care program, the coinsurance is not applicable.  A case manager for the insurance company manages these patients' care. Supervisors are in regular contact with the SNF, to determine needs for skilled care and appropriate discharge and post discharge placement.

25.     Medicaid is a program of the federal government, created by Title XIX of the Social Security Act.  The Medicaid law is codified at 42 U.S.C. §§1396 et seq., and its regulations are located at Title 42 C.F.R. Part 483. The Medicaid system relies upon state and federal funds to pay for the care of patients in nursing homes.  Medicaid payments are based upon a partial

8

payment system, whereby the federal government pays a fixed proportion of the costs of care related to the economic status of the state's participants.

26. Medicaid, like Medicare, pays for patient care based upon patient diagnosis, need for treatment, and need for care and assistance. However, in Tennessee, the Medicaid program will not pay for a rehabilitative stay in an SNF, but will pay for physical therapy, occupational therapy, speech therapy, and other services under a physician's order and general supervision. Medicaid will also cover the copayment portion of a qualified Part A Medicare stay for those economically qualified for both Medicare and Medicaid.

27. Federal and state laws and regulations make the offering of kickbacks a criminal offense. The use of a discounted rate, in exchange for the continued admission to a Medicare facility; the failure to offer a discount to Medicare, Medicaid, Tricare, FEHBP, and the Veterans' Administration; and the failure to report this discounted rate to the government, is a violation of the Anti-Kickback Statute, Social Security Act § 1128b(b), 42 U.S.C. § 1320a-7b(b); 42 U.S.C.S. §1320. The AKS makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce or reward referrals of items or services reimbursable by a federal health care program.

28. Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a federal health care program, the AKS is violated. "Remuneration" includes the transfer of anything of value in cash or in kind, directly or indirectly, covertly or overtly, if one purpose of the remuneration is to obtain money for the referral of services, or to induce further referral of services.

29. In the Department of Health and Human Services ("HHS") Office of the Inspector

9

General ("OIG") Advisory Opinion 02-07, the OIG found an impermissible potential kickback where a service provider requested the right to waive the copayment for one category of patients. The proposed waiver would only be applied to some patients, not all, and would not be need based. OIG found that the proposed waiver would impermissibly benefit the SNF, a potential source of referrals, by reducing the amount of administrative paperwork necessary for the SNF to collect the funds. OIG found this proposed waiver impermissible.

30.     In Advisory Opinion 01-3, the OIG did not find an impermissible kickback, but noted that "the routine waiver of all or a portion of the Medicare copayment is suspect under the anti-kickback statute....copayment waivers also potentially implicate section 1128A(a)(5) of the Act, the prohibition on inducements offered to Medicare and Medicaid beneficiaries."

31.     In Advisory Opinion 98-6, the OIG found an SNF's routine waiver of copayments from a secondary insurer to be impermissible kickbacks, because "[a]rrangements that release both the beneficiaries and the secondary insurer from the obligation to pay Medicare cost-sharing amounts pose a risk of overutilization and increased program costs."

> Thus, under the Arrangement, the Nursing Home may have an incentive to prolong Medicare patient stays in order to recoup forgone copayments, while the Plan has no incentive to control costs associated with Medicare fee-for-service beneficiaries for whom it pays little or nothing. Moreover, to the extent that the Nursing Home receives less than the applicable RUGs III reimbursement rate (including copayments and deductibles), the Nursing Home may have an increased incentive to shortchange Medicare beneficiaries by stinting on services. Finally, the Arrangement may lead to unfair competition for competing health plans that meet their insureds' Medicare copayment obligations and refuse to participate in comparable schemes. Given these risks, we cannot conclude that the Arrangement poses little or no risk of Federal program fraud or abuse.

32.     As a Condition of Participation in the Medicare program and as a condition precedent to the receipt of reimbursement from Medicare for providing care to Medicare

beneficiaries, defendants Lebanon Health and Sava certified that they were familiar with the laws and regulations regarding the provision of healthcare services, and that <u>ALL</u> services identified in the cost reports were provided in compliance with Medicare laws and regulations.

33.     As a Condition of Participation in the Medicare program, and as a condition precedent to the receipt of Medicare reimbursement, defendants Lebanon Health and Sava are required to certify annually that its services to Medicare beneficiaries are provided in compliance with laws and regulations regarding the provision of healthcare services.

34.     Defendants Sava and Lebanon Health have in fact certified compliance with Medicare laws and regulations, including but not limited to the AKS, each year beginning in at least 2005 to present.  These certifications are filed, upon information and belief, annually.

35.     As a further Condition of Participation in the Medicare program, defendants Lebanon Health and Sava  completed Medicare enrollment applications, each of which contained the certification of defendants Lebanon Health and Sava that they accepted the responsibility for insuring a) adherence to all Medicare laws and regulations that dictate the proper operation of its business;  b) adherence to Medicare policy requirements established by the federal government; and c) that defendants Lebanon Health and Sava  would not participate in prohibited referrals or false claims or statements to Medicare.

36.     The certifications filed annually by defendants Sava and Lebanon Health are false, in that these defendants have violated federal and state laws, by participating in illegal kickback schemes.  Defendants have also violated federal and state laws by extending patients stays, without medical necessity for these stays.  Defendants billed the government for medically unnecessary services.  Both of these false certifications are material to the government's

11

decisions to pay.

37.     Defendants Lebanon Health and Sava violate the Anti-Kickback Statute when they waive the co-pay requirement of nursing home residents, thereby providing services at less than cost or value, implicitly in exchange for the patients agreeing to extend their stay in defendants' property.  Defendant Lebanon Health knew, and defendant Sava knew, or should have known, that defendant Lebanon Health was waiving co-payments.  As a result, every Provider Agreement submitted by Sava and Lebanon Health is false; and every bill for services and cost report submitted by Sava and Lebanon Health is also false.  Upon information and belief, this waiver of co-payments, in violation of the Anti-Kickback Statute, also occurred at other defendant Sava facilities.

38.     Every billing statement, and cost report, submitted by defendants Sava and Lebanon Health is also false when it is submitted for services that are not medically necessary.

IV.     **SPECIFIC ALLEGATIONS OF FRAUD**

1.     **Falsification of Records to Extend Medicare Length of Stay**

39.     Defendant Lebanon Health, a division of defendant Sava, operates a sixty (60) bed rehabilitation facility.   Each of the sixty (60) beds in the facility is certified to provide services to patients covered as beneficiaries by the Medicare program.

40.     On February 28, 2009, defendant Lebanon Health hired Ms. Hayward as the social services director.  Ms. Hayward's job tasks included patient psycho-social assessments, patient discharge planning, patient referrals, and attendance at daily care plan meetings (also called "the morning meeting").

41.     Defendant Nichole McCaleb was, and is, the nursing home administrator for

12

defendant Sava at defendant Lebanon Health.

42.     Every morning, defendant McCaleb would require all administrative personnel, including but not limited to, the heads of each department, and Ms. Hayward, the director of Social Services, to attend the morning meeting.  At this meeting, patient admissions and discharges were discussed.

43.     All of Medicare patients at defendants Sava and Lebanon Health were receiving care based upon the certification that these patients required skilled nursing services.  Some of these Medicare patients were receiving benefits through the Medicare program, while others were receiving benefits through a Medicare Managed care program.

44.     Patients routinely are required to be evaluated upon admission to defendant Sava and Lebanon Health.   These admission evaluations must be completed within a reasonable amount of time to insure proper evaluation, treatment, and diagnosis of the patients.

45.     Patient care plan meetings, for purposes of evaluation,  occur within seventy two (72) hours of a patient's admission, and then at five (5) days of admission; then every fourteen (14) days, until discharge, or one hundred (100) days of skilled care was reached.  At these care plan meetings, Medicare patient RUG classifications are determined, for purposes of billing Medicare.

46.     Based upon these evaluations, physician orders are written for the patients.

47.     Based upon these evaluations and medical records, Medicare is billed.

48.     In Tennessee, Medicare Part A pays one hundred percent (100%) of the first twenty (20) days of a qualified SNF stay.  From the twentieth to the one hundredth day, the patient pays twenty percent (20%) and Medicare pays eighty percent (80%) of the allowed

13

charges.

49.     Every seven to fourteen days, the patient is evaluated based upon RUG classifications, to determine whether the patient still has a need for "skilled nursing services," as that term is defined by Medicare.

50.     When the patients no longer need skilled nursing services, meaning they no longer fit within a RUG classification for Medicare-paid services, the patient must be discharged from the facility.

51.     Employees of the defendants, at the direction of defendant McCaleb, routinely alter records regarding patient care to make it appear that patients require more care than they actually need; or that they continue to need care when in fact there is no longer a need for skilled nursing or rehabilitative care. Such alterations are in violation of 42 CFR §483.20, which requires a comprehensive, accurate, and reproducible assessment of patient's functional capacity, and requires that this assessment accurately reflect the patient's current status.

52.     For example, defendants have falsified Medicare and Medicaid certification and recertification documents. Such documents include those for Patients A, B, C, D, E, and F.

53.     These false certifications were done to extend the days of care, and levels of care, required for patients. These false certifications were only done on Medicare patients, as those patients with Medicare managed care were not permitted by the Medicare case managers to have extended stays. Therefore, defendant McCaleb did not falsify, or direct others to falsify, the records of the Medicare managed care patients, as defendant McCaleb was aware that these patients' stays could not be extended.

54.     Patient A was a Medicare beneficiary who was admitted to defendants Sava and

14

Lebanon Health on January 30, 2010. Patient A was ready for discharge on February 22, 2010, but her stay was extended to February 26, 2010, solely to increase the amounts of Medicare funding paid to defendants Sava and Lebanon Health. As a result of these false records, from January 30, 2010, until at least February 26, 2010, bills were submitted to Medicare for payment, and Medicare paid for medically unnecessary services.

55.     Patient B was admitted repeatedly to defendants Sava and Lebanon Health. On February 12, 2010, patient B, with a history of psychological problems, was admitted with a fractured ankle. Patient B would leave the facility to shop at the local markets, keeping his food in the staff refrigerator.

56.     Patient B was told by defendant McCaleb that he could stay for an extended period of time at Sava/Lebanon Health. Therefore, Patient B brought all of his personal belongings to the facility.

57.     When confronted on more than one occasion by Ms. Hayward (such as on February 23, 2010, and April 8, 2010), with the information that his Medicare paid stay was ending, Patient B stated that "Ms. Nicki (defendant McCaleb) said I can stay." Other departments, including physical therapy, were instructed by defendant McCaleb to find a "reason" to extend Patient B's stay.

58.     As of April 22, 2010, Ms. Hayward's last day at defendant Lebanon Health, Patient B was still a Medicare patient at Sava/Lebanon Health.

59.     As a result, from February 12, 2010, until at least April 22, 2010, bills were submitted to Medicare, and Medicare paid for, medically unnecessary care for Patient B.

60.     Patient C was an elderly woman admitted for rehabilitation. Ms. Hayward was

15

involved in planning Patient C's discharge.  In the discharge planning, Patient C requested a hospital bed for her home.  Ms. Hayward arranged for a hospital bed to be delivered to Patient C's home, but Patient C did not like the bed, and requested that it be replaced.  Patient C also wished to have time so that her home's furniture could be rearranged before she returned home.

61.     Defendant McCaleb instructed Ms. Hayward to find a way to extend Patient C's stay at Lebanon Health until a new bed arrived at Patient C's home and the furniture was moved.  Ms. Hayward was fired shortly thereafter; and is not aware of how long Patient C remained as an inpatient at Lebanon Health.  As a result, in April of 2010, bills were submitted to Medicare, and Medicare paid for, medically unnecessary care for Patient C, so that Patient C's home furniture could be moved.

62.     Patient D was an elderly man who lived at home, and ambulated with a walker.  Patient D fell at home, and fractured some ribs.  Patient D was admitted to Lebanon Health on March 10, 2010, for physical and occupational therapy.  On March 30, 2010, after two weeks of admission, Patient D was told he had to stay an additional two weeks for care.  Patient D, and his family, refused to stay this length of time, despite directions from defendant McCaleb to extend Patient D's stay.  Patient D was scheduled to be discharged on April 2, 2010, but this date was again extended.  On April 5, 2010, Patient D's Medicare notice of discharge was filed.  Patient D was finally discharged on April 15, 2010.

63.     As a result, from March 10, 2010, until at least April 15, 2010, bills were submitted to Medicare for payment, and Medicare paid for medically unnecessary care for Patient D.

64.     Patient E was an elderly woman who was admitted to Lebanon Health on March

16

19, 2010.  Patient E was a patient at an assisted living facility before she was admitted to

defendants' facility.  When Patient E was medically ready for discharge, defendant McCaleb, or

someone on her behalf, called Patient E's daughter, telling the daughter that Patient E was not

ready for discharge and would have to stay for an extended period of time.

65.     Patient E's daughter was aware that Patient E was medically ready for discharge.

Patient E was paying for her bed space at a long term care facility, even while an inpatient at

Lebanon Health.  Patient E's daughter called Ms. Hayward, and told Ms. Hayward that defendant

McCaleb was keeping Patient E at Lebanon Health for no medical reason.  As a result, on April

8, 2010, Patient E's daughter came to Lebanon Health, and took Patient E back to her long-term

care facility.  Upon information and belief, from March 19, 2010, until at least April 8, 2010,

bills were submitted to Medicare for payment, and Medicare paid for medically unnecessary care

for Patient E.

66.     Patient F was admitted on March 24, 2010.  Patient F told Ms. Hayward on April

1, 2010, that she wished to be discharged, but she could not leave because physical therapy told

Patient F that her discharge could not occur.  Ms. Hayward spoke to the physical therapy

department, which stated that Patient F could leave whenever she wanted to leave.  Despite this,

Patient F was not discharged until April 7, 2010.

67.     As a result, from March 24, 2010, until at least April 7, 2010, bills were submitted

to Medicare for payment, and Medicare paid for medically unnecessary care for Patient F.

68.     For the entire time of her employment, Ms. Hayward was counseled by defendant

McCaleb to instruct patients that they could not leave until defendant McCaleb permitted their

discharge.  When Ms. Hayward was questioned by patients, and their families, as to why they

17

could not be discharged, Ms. Hayward was instructed by defendant McCaleb to tell patients and families that the patient had to stay, or "Medicare would not pay."

69.     Ms. Hayward was instructed by defendant McCaleb to get physical therapy, occupational therapy, or the nursing staff, to find reasons for patients' stays to be extended.

70.     These instructions occurred at the morning staff meetings, and were given by defendant McCaleb with physical therapy, nursing, dietary, occupational therapy, and other staff members present.

71.     On more than one occasion when defendant McCaleb gave the instruction to extend a patients' stay, Bree Hallum, one of the nursing supervisors, would comment , "You know, Nicki [defendant McCaleb], I don't look good in orange," referring to the color of prison uniforms.  All of the attendees at these meetings knew that defendant McCaleb was asking them to falsify medical records, and Medicare/Medicaid records, claims, and submissions.

**2.      Waiver of Co-Pays in Violation of Anti-Kickback Statute**

72.     Medicare patients whose stays exceeded twenty days at defendants Lebanon Health and Sava are required, by Medicare regulations, to pay a twenty percent (20%) co-pay for their stays.

73.     Defendant McCaleb knew that this 20% co-pay would make many patients leave the facility, or refuse to extend their stay at the facility, thereby thwarting defendants' scheme to extend patients' stays.

74.     Defendant McCaleb directed Ms. Hayward, among others, to tell patients to "throw away" or "rip up" the bills generated by defendants Lebanon Health and Sava. Defendant McCaleb would tell patients, and direct staff to tell patients: "If you receive a bill just

18

flick it into the wastebasket.  After your third notice you will not receive any more and it is not reported to the credit bureaus.   It will not hurt your credit."  These directions to patients were given from at least February, 2009, when Ms. Hayward joined the facility, until Ms. Hayward was terminated in April, 2010.

75.     Defendant McCaleb told Ms. Hayward, and the staff at defendants Lebanon Health and Sava, that Medicare patients did not have to pay any co-pays.

76.     These co-pays were waived for Medicare patients to encourage or induce these patients into staying for longer periods of time.  Upon information and belief, these co-pay waivers were offered to Patients A, B, C, D, E, and F.  Among other things, this belief is held because these patients had extended Medicare stays at defendants Sava and Lebanon Health.

77.     These co-payment waivers reduced the costs to Medicare patients to eighty percent (80%) of the RUG rate associated with each patients' stay.  However, these co-payment waivers did not reduce the costs to Medicare.

78.     Defendants offered these discounts to patients staying past the twenty day point, as an inducement to extend the patients' stays.

79.     Defendants did not offer these discounts to Medicare, Medicaid, Tricare, the Veteran's Administration, or other private insurers.

80.     Defendants' actions of waiving Medicare co-payments  amount to illegal remuneration in violation of the AKS.

19

**COUNT I**
**FALSE CLAIMS ACT**
**31 U.S.C. §3729 et seq.**

81.     Ms. Hayward incorporates paragraphs 1 through 80 above as if fully set forth
herein.

82.     This is a claim for treble damages and penalties under the False Claims Act, 31
U.S.C. § 3729, *et seq*., as amended.

83.     Defendants Sava and Lebanon Health submitted claims, that were requests for
payment or approval, to the federal government.  Defendants Sava and Lebanon Health
submitted claims for payment or approval, to a contractor, grantee, or other recipient of federal
funds.

84.     Defendants Sava, Lebanon Health, and McCaleb made, used, or caused to be
made or used, claims to get money or property from the government.

85.     These claims were false due to improper upcoding as well as violations of the
Anti-Kickback Statute.

86.     These false claims were submitted to the government, with knowledge of their
falsity.

87.     These false claims were submitted to contractors, grantees, or other recipients of
federal funds.

88.     These false claims were knowingly submitted for payments or approval.

89.     The falsity of these claims was material to the government's decision to pay these
claims.

90.     The false claims, knowingly submitted to the government, were paid by the

20

government.

91.    Defendants were aware that the funds they received were to be spent or used on the government's behalf, and/ or to advance a government program or interest.  Defendants were aware that the United States government provides or has provided any portion of the money requested or demanded from the government, or its contractors, and  were aware that the government will reimburse such contractor, grantee, or other recipient for any portion of the money requested or demanded.

92.    The defendants' false and fraudulent submissions, and requests for payment, have and had a natural tendency to influence, or be capable of influencing, the payment of funds to defendants.

93.    By virtue of the acts described above, Defendants Sava and Lebanon Health knowingly presented or caused to be presented, false or fraudulent claims to the United States government for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

94.    By virtue of the acts described above, all defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, material to a false or fraudulent claim, in violation of 31 U.S.C. §3729(a)(1)(B).

95.    By virtue of the acts described above, defendants Sava, Lebanon Health, and McCaleb conspired to commit violations of the False Claims Act, 31 U.S.C. §3729(a)(1)(A) and (B), in violation of 31 U.S.C. §3729(a)(1)(C).

96.    Each submission to the government by defendants for payment or approval represents a false or fraudulent record or statement and a false or fraudulent claim for payment, because defendants violated a precondition of participation and payment, that is, compliance

21

with the Anti-Kickback Statute.

97.     Each submission to a contractor with the Government, by the defendants, for payment and/or approval, represents a false or fraudulent record or statement and a false and/or fraudulent claim for payment.

98.     Ms. Hayward cannot at this time identify all of the false claims for payment that were caused by defendants' conduct, as the voluminous records of this conduct are exclusively in the control of the defendants.

99.     The government, unaware of the falsity of the records, statements and claims made or caused to be made by the defendants, paid and continues to pay the claims that would not be paid but for defendants' false and fraudulent claims for payment.

100.    By reason of the defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

**PRAYER**

WHEREFORE, Ms. Hayward prays for judgment against the defendants as follows:

        A.     that defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

        B.     that this Court enter judgment against defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 et seq.;

        C.     that Ms. Hayward be awarded all costs of this action, including litigation costs, attorneys' fees and expenses; and

        D.     that Ms. Hayward recover such other relief as the Court deems just and

22

proper.

## COUNT II
## FALSE CLAIMS ACT RETALIATION

101.    Plaintiff repeats paragraphs 1 through 100 as though fully set forth herein.

102.    Section 3730(h) of the False Claims Act provides that "[a]ny employee,
contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or
agent whole, if that employee, contractor, or agent is discharged, demoted, suspended,
threatened, harassed, or in any other manner discriminated against in the terms and conditions of
employment because of lawful acts done by the employee, contractor, agent or associated others
in furtherance of an action under this section."  31 U.S.C. §3730(h).

103.    During her employment, Ms. Hayward  engaged in numerous lawful acts which
furthered her *qui tam* investigation, and ultimately led to this lawsuit.  During her employment,
Ms. Hayward investigated the fraud described above, and placed defendants on notice of the
alleged fraud.  Ms. Hayward told defendant McCaleb that she would not participate in this fraud
on the Medicare system; and told the HR director of Sava that she would not participate in this
ongoing fraud on the Medicare program.

104.    Lebanon Health had sixty beds, fifty of which were for rehabilitation.  When the
census in those fifty beds would reach below forty-five, defendant McCaleb would place
tremendous pressure on Ms. Hayward to increase the census.  Defendant McCaleb instructed Ms.
Hayward not to permit more than one Medicare patient to be discharged per day.

105.    When a patient was preparing for discharge, a family member was required to
sign the discharge paper.  When Ms. McCaleb extended a patient's stay at Lebanon Health, she

23

directed Ms. Hayward to take the original signed form from the family member, but not cross out the discharge date, and instead create a new discharge form with the form containing the family signature as a secondary page. This process occurred so that a reviewer would not question the existence of more than one discharge form.

106. During the course of her employment, upon information and belief after January 1, 2010, Ms. Hayward voiced her complaints about improper Medicare practices to the human resources director for Sava, Jennifer Burrell. Ms. Hayward also placed her complaints in written form, on more than one occasion. Despite this reporting, no changes occurred at Lebanon Health in the practice of extending the stay of patients in order to increase billings, or waiving co-payments for Medicare patients. Upon information and belief, Ms. Burrell resigned.

107. Sandy Johnson, who became the head of human resources after Ms. Burrell, was also aware of the billing improprieties and co-payment waivers, as she attended morning meetings on an occasional basis.

108. As a result of her complaints about false claims and potential frauds, Ms. Hayward was threatened, harassed, and discriminated against in the terms and conditions of her employment.

109. As a result of her complaints and actions taken in furtherance of her *qui tam* investigation, Ms. Hayward was terminated from her employment, solely as retaliation for Ms. Hayward's lawful acts.

**PRAYER**

WHEREFORE, Ms. Hayward prays for judgment against the Defendants as follows:

        A.     that defendants cease and desist from violating 31 U.S.C. § 3730 (h).;

B.     that this Court enter judgment for Rita Hayward, and against defendants, and award Ms. Hayward reinstatement with the same seniority status that Ms. Hayward would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination;

C.     that Ms. Hayward be awarded all costs of this action, including litigation costs, attorneys' fees and expenses; and

D.     that Ms. Hayward recover such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED,


s/ Patrick Barrett
PATRICK BARRETT (No. 20394)
Barrett Law Office, PLLC
2021 Richard Jones Road, Suite 300
Nashville, Tennessee 37215
615.463.4000
615.463.3717 fax
pbarrett@barrettlawofficetn.com

W. MICHAEL HAMILTON (No. 10720)
Provost Umphrey Law Firm L.L.P.
2021 Richard Jones Rd , Ste 300
Nashville, TN 37215
(615) 242-0199
mhamilton@provostumphrey.com

REGINA D. POSERINA
PA Attorney ID 66486
7415 West Chester Pike

25

Upper Darby, PA 19082
(610) 352-0760
Email: rposerina@verizon.net
(Not admitted to this Court or Tennessee)

26