# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel*. | ) | |
| RITA HAYWARD, TRAMMELL KUKOYI, | ) | |
| and TERRENCE SCOTT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Nos. 3:11-00821; 3:15-00404 & |
| | ) | 3:15-01102 |
| SAVASENIORCARE, LLC, | ) | Judge Sharp |
| SAVASENIORCARE CONSULTING, LLC, | ) | |
| SAVASENIORCARE ADMINISTRATIVE | ) | |
| SERVICES, LLC, and SSC SUBMASTER | ) | |
| HOLDINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

This is an action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, originally brought by Relators Rita Hayward (Case No. 3:11-00821), Terrence Scott (Case No. 3:15-00404), and Trammell Kukoyi (Case No. 3:15-01102). The Government elected to intervene,[1] the cases were consolidated into Case No. 3:11-00821, and the Government filed a 48-page, 211-paragraph Consolidated Complaint in Intervention (Docket No. 59, hereinafter cited as "CC").

The essence of the Government's Complaint is that, between October 1, 2008, and September 30, 2012, Defendants SavaSeniorCare, LLC, SavaSeniorCare Consulting, LLC, SavaSeniorCare Administrative Services, LLC, and SSC Submaster Holdings, LLC (collectively "Sava" or "Defendants,") improperly received millions of dollars by submitting false or fraudulent claims for payment to Medicare for rehabilitation services that were not medically reasonable and

---

[1] The Government only intervened on certain claims alleging Defendants submitted (or caused to be submitted) false claims to Medicare for skilled nursing benefits. (Docket No. 52).

1

necessary and/or not skilled in nature. Defendants now move to dismiss that Consolidated Complaint, along with the First Amended Complaints filed by Relators Hayward and Kukoyi.[2]

## I. Factual Allegations

Common to the Motions to Dismiss is that the allegations fail to state a claim and, more specifically, that the alleged false statements are insufficiently plead. All of the parties point to the Consolidated Complaint to support their arguments on this central issue and it is for this reason, as well as the relevant standards of review, that the Court sets out the allegations in more detail than usual.[3] Of course, most of what follows are mere allegations at this point and nothing more.

## A. Medicare Benefits Scheme

The Medicare program is divided into four "Parts" that cover different services. Medicare Part A, the one at issue here, generally reimburses inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care. It covers up to 100 days of skilled nursing and rehabilitation care for a benefit period, following a qualifying hospital stay of at least three consecutive days.

The daily reimbursement rate from Medicare for skilled nursing services and rehabilitation care varies based on the anticipated nursing and rehabilitation needs of the beneficiary. It depends, in part, on the Resource Utilization Group ("RUG") to which a patient is assigned, and, in part, on the patient's ability to perform certain Activities of Daily Living ("ADL").

There are five RUG levels: Rehabilitation Ultra High ("RU"); Rehabilitation Very High

---

[2] Relator Scott voluntarily dismissed Counts III and V of his First Amended Complaint and all other non-intervened allegations (Docket No. 131). His claim for retaliation was severed and stayed pending arbitration (Docket No. 137).

[3] Even though the Court in many instances draws heavily on the exact language in the Consolidated Complaint, it serves no useful purpose to provide repeated citations to that document. Instead, the Court provides specific citations only for the material appearing in quotation marks.

("RV"); Rehabilitation High ("RH"); Rehabilitation Medium ("RM"); and Rehabilitation Low

("RL"). The RUG level to which a patient is assigned depends upon both the number of skilled

therapy minutes and the number of therapy disciplines the patient received during a seven-day

assessment period as reflected in the following chart:

| Rehabilitation RUG level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra High | 1. Minimum 720 minutes per week total therapy<br>2. At least two therapy disciplines<br>3. One discipline[4] must be provided at least 5 days/week RV = Very High |
| RV = Very High | 1. Minimum 500 minutes per week total therapy<br>2. One therapy discipline must be provided at least 5 days/week |
| RH= High | 1. Minimum 325 minutes per week total therapy<br>2. One therapy discipline must be provided at least 5 days/week |
| RM = Medium | 1. Minimum 150 minutes per week total therapy<br>2. Therapy must be provided at least 5 days/week<br>3. Can be any mix of therapy disciplines |
| RL = Low | 1. Minimum 45 minutes per week total therapy<br>2. Therapy must be provided at least 3 days/week<br>3. Can be any mix of therapy disciplines |

(CC ¶ 40). Obviously, Medicare reimburses more for patients that are in the RU category, which

is intended to apply only to the most complex cases.

Within each RUG level, reimbursement varies based on the patient's ADL, which considers

things such as eating, using the toilet, bed mobility, and transfers (e.g., from a bed to a chair). It also

considers the extent to which the patient needs "extensive services," such as intravenous treatment,

a ventilator, tracheotomy, or suctioning. ADL scores of A, B, C, L, or X are assigned to each

patient. Generally, a patient who can perform the activities of daily living without assistance is an

"A"; a patient who requires assistance with all of the activities, but does not require any of the

---

[4] Disciplines include physical therapy, occupational therapy, and speech-language pathology.

extensive services, is a "C"; a patient who requires only one of the extensive services is an "L"; and a patient who requires several of the extensive services is an "X."

The Medicare daily reimbursement rate varies significantly depending upon the RUG level and ADL score. Just by way of examples, and using the 2012 rates, the rate was $737.08 for an RU patient with an "X" ADL score; $471.71 for an RH patent with a "C" ADL score; and $229.89 for RL patient with an "A" ADL score.

Skilled Nursing Facilities ("SNFs") are required to periodically assess each patient's condition and submit the results on a Minimum Data Set ("MDS") form, which is used to determine the daily reimbursement rate. Generally, patients must be assessed and the MDS form completed on the 5th, 14th, 30th, 60th, and 90th day of the patient's stay in the facility. The date of the assessment is known as the "assessment reference date," and that assessment (except for the first one) looks at the patient for the seven preceding days, which is the "look-back period." (CC ¶ 47). SNFs are required to report on the MDS the number of minutes of skilled rehabilitation therapy the facility provided to a patient during the look-back period as well as the type(s) of therapy provided.

Medicare payments are made prospectively for a defined period of time. For example, if a patient is assessed on day 14 of his stay, and received 720 minutes of therapy during days 7 through 14 of the stay, then the facility is paid for the patient at the Ultra High RUG level for days 15 through 30 of the patient's stay.

Completion of the MDS is a prerequisite to payment under Medicare. The MDS itself requires a certification by the provider that states, in part:

> "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds."

(CC ¶ 51).  Forms are submitted electronically to Medicare payment processors.

## B. Sava's Structure and Operations

Sava is "organized in a pyramidal corporate structure."   (CC ¶ 54).  Defendant SavaSeniorCare, LLC "sits atop" that structure,  and, through its subsidiaries, owned and managed the operations of approximately 185 SNFs in 19 states (including Tennessee) during the relevant period.   (CC ¶ 20).   The remaining Defendants are (or were) wholly owned subsidiaries of SavaSeniorCare, LLC: (1) SavaSeniorCare Consulting, LLC provided consulting services and operational oversight to the SNFs, and employed most of the corporate-level rehabilitation and operations employees; (2) SavaSeniorCare Administrative Services, LLC performed certain "back-office" services for Sava's SNFs, including submitting claims to Medicare, and employed Sava's Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), Senior Vice President ("SVP") of Rehabilitation Services, and high-level finance employees; and (3) SSC Submaster Holdings, LLC provided services for the SNFs and employed many of Sava's corporate-level rehabilitation and operations employees, some of whom later went to work for SavaSeniorCare Administrative Services and SavaSeniorCare Consulting when SSC Submaster Holdings ceased to exist in 2010.

Tony Oglesby "is at the top of Sava's corporate structure," serving as its CEO since 2005, and  acquiring  a  majority  ownership  in  Sava  in  October  2013.  (CC ¶ 54).   The  corporate rehabilitation department is led by Stacey Hallissey, who served from 2006 through at least 2012 as SVP of Rehabilitation Services and reported directly to Mr. Oglesby.

"Sava is organized in geographic divisions below Mr. Oglesby," and, although its structure changed over time, for most of the relevant time period, it had two division, East and West, that, in

turn, were subdivided into regions. (CC ¶ 55). Division Vice Presidents ("DVPs") of Rehabilitation Services report directly to Ms. Hallissey; the Regional Director of Rehabilitation ("RDR") in each region reported to his or her DVP.

The rehabilitation department at each SNF was managed by a Rehabilitation Program Manager ("RPM") who reported to the regional director and also reported to the SNF administrator. For the most part, the SNF administrators had no clinical training or certification in the provision of skilled rehabilitation therapy, but nevertheless often participated in planning patient care.

The therapy staff of each facility typically included physical therapists, physical therapy assistants, occupational therapists, certified occupational therapy assistants, and speech language pathologists. Each facility also had at least one MDS coordinator (usually a registered nurse) who was ostensibly responsible for collecting all of the information needed for the MDS and determining the assessment reference date. In practice, however, Sava's corporate rehabilitation department pushed facility-level employees to choose the days that would result in the highest RUG level and, therefore, the highest payment.

Control over the submission of claims for services provided at the SNFs was centralized, as was the receipt of reimbursements. That is, even though individual facilities had their own bank accounts, all payments received for Medicare services provided at Sava SNFs were placed into a "single 'concentration' account maintained by the company." (CC ¶ 71).

Sava knew the financial benefits of increasing its Ultra High billings. SNF administrators, RPMs, and therapists were systematically pressured by corporate to meet targets for such billings and extend patient stays without regard to a patient's actual needs. Beginning in 2008, if not earlier, Sava's finance department set top-level goals – "budgets" – for the Company, that, in turn, trickled

down to rehabilitation-specific goals at the divisional, regional and facility level. Thus, each of the SNFs was given set goals that were based on meeting pre-determined RU levels and Medicare Part A daily rates. Even though DVPs of Rehabilitation Services and RDRs could change the budget for a facility in their division or region, any changes had to be "budget neutral," meaning that if an RU goal was reduced at one facility, it had to be increased at another.

Internally-created metrics were used to monitor the Company's performance in billing Medicare for the highest-reimbursing RUG codes. Various strategies were employed to meet the RU and Medicare Part A daily rate budgets, including setting RU as the "default" RUG level for newly-admitted patients, and instructing SNFs to aim for an RU if the patient could "tolerate" 720 minutes of therapy each week.

Sava consistently increased the budgets for each facility based upon its "past performance plus a 'stretch' of that performance," even though it knew the "budgets were aggressive." (CC ¶¶ 81, 82). Facilities were told the budgets were not optional, notwithstanding opinions by corporate managers and facility RPMs that a given budget was unattainable.

Constant pressure was placed on both regional and facility-level employees to make their ever-increasing budgets. This pressure "was top-down, nationwide, and exerted by both rehabilitation and operations corporate-level employees." (CC ¶ 93). Enforcement of the goals was achieved through various devices, including action plans, performance evaluations, calls and visits to facilities, threats of repercussions or termination for poor performers, and bonuses for those that did well. Facilities were also ranked – those that performed well were applauded, while those that did not were singled out and "publicly shame[d] . . . into improving their performance." (CC ¶ 115).

A patient's refusal to participate in therapy was not an acceptable reason to miss scheduled therapy minutes. And, if a therapist in one discipline did not achieve enough minutes with a particular patient, a therapist in a different discipline would be instructed to make up minutes that were needed to move the patient into the RU category.

Therapists were instructed to allocate the time for group (involving two to four patients) and concurrent (involving two residents) therapy exercises so as to maximize RU billings,[5] even though the group and concurrent exercises often did not relate to a patient's plan of care or include activities in which he or she could have reasonably been expected to participate. Sava also pushed modalities[6] to increase its RU billings. Further, because additional minutes of therapy beyond the 720 minute threshold did not result in any increase in Medicare payments for RU patients, Sava "leadership actively policed therapy 'overages' (i.e., providing rehabilitation therapy minutes to patients in excess of RUG level thresholds)," so as to avoid giving away "free therapy." (CC ¶ 138).

The pressure was not limited to ensuring that patients fell into the RU level. It also extended to keeping patients in its Defendants' SNFs longer than was reasonable and necessary in order to increase reimbursement. "Census," or the number of inpatients, was a "wildly important goal," and this meant "not just getting the patients in the door," but "keeping them in there with extended lengths of stay." (CC ¶¶ 148, 149).

Strategies were employed to retain patients, such as requiring facilities to seek permission from RDRs before discharging Medicare beneficiaries who had yet to exhaust their 100-day SNF

---

[5] Up until October 1, 2010, an hour of group or concurrent therapy could be attributed as 60 minutes for each participant when determining the RUG level. After that date, the minutes in such sessions were divided among the participants. When the reimbursements for concurrent and group therapy were reduced, the amount of such therapy that Sava provided to its Medicare patients "plummeted." (Id. ¶ 126).

[6] These are treatments such as ultrasound, shortwave, microwave diathermy, electrical muscle stimulation "E-Stim"), hot packs, and whirlpool baths.

benefit, even though those RDRs had likely never met, evaluated, or had any firsthand knowledge regarding the clinical needs of any of the patients. One facility even used a form explicitly requiring therapists not to write discharge orders without first obtaining approval from an RPM and/or RDR, and explicit length of stay goals were imposed by Sava on some facilities. Such practices ignored patient needs, sometimes resulting in patients unnecessarily exhausting all 100 days of the Medicare SNF benefit.[7]

Sava's efforts to increase Medicare Part A billings was enormously successful. In fiscal year 2006, Sava billed Medicare at the Ultra High level for 21 percent of all rehabilitation days. In fiscal years 2010 and 2011, Sava billed 63 percent of its rehabilitation days at the Ultra High level, tripling its fiscal year 2006 Ultra High percentage. Some specific SNFs were even more successful.[8]

The allegations regarding budgeting, the enforcement of goals, the demand for increases in RU levels, the ranking and scrutinizing of facilities, the maximization of group and concurrent therapy, the use of modalities to increase minutes, and the avoidance of overages are all supported by emails excerpted in the Consolidated Complaint. These include emails between and among a wide variety of employees, including SVP Hallissey, DVPs, RDRs, RPMs, administrators and other managers.

## C. Specific Patients

The Consolidated Complaint identifies five specific patients, and attaches a summary chart

---

[7] This left beneficiaries with no Medicare Part A coverage for at least 60 days.

[8] For example, the Durham, North Carolina SNF increased from billing 57 percent of its rehabilitation days at the RU level in fiscal year 2006 to billing 96 percent at the RU level in fiscal year 2009 and 95 percent in 2010; Woodwind Lakes SNF in Houston, Texas, increased from billing 16 percent of its rehabilitation days at the RU level in 2006 to billing 72 percent at the RU level in 2009 and 84 percent in 2010; and the Pendleton facility in Mystic, Connecticut, increased from billing 37 percent of its rehabilitation days at the RU level in 2006 to billing 59 percent in 2009, 74 percent in 2010, and 80 percent in 2011.

of 20 allegedly false claims made by Sava for those patients that and are said to be "illustrative samples of the types of false claims submitted to Medicare by Sava between October 1, 2008 and September 30, 2012." (CC ¶ 198). The specific allegations regarding each of those patients are as follows:

### Patient A

Patient A is an 85-year-old female patient who was admitted to Sava's Northwest facility in Houston, Texas. She received physical and occupational therapy, and speech-language pathology services beginning in April 2011:

The therapy evaluation and treatment minutes recorded on Patient A's first therapy day totaled six hours and 10 minutes. During Patient A's physical therapy evaluation on that first day, she was too fatigued to perform a balance test and was only able to tolerate sitting on the edge of a bed for 15 minutes. Nevertheless, Sava billed for 60 minutes of physical therapy that same day.

Patient A had a history of dementia; her associated profound cognitive issues meant that her ability to retain and learn new information was very limited. During a mental status test, Patient A did not know the season, her room location, or even that she was in a nursing home. Many of the progress notes from Patient A's stay reference that the patient said "no" to "everything." The therapists treating Patient A constantly discontinued or reduced her therapy goals because they were too difficult for her. The speech-language pathologist's discharge summary for Patient A indicated minimal change in function over the two months of speech language pathology intervention.

One weekly physical therapy progress note stated that Patient A was to be discharged soon due to lack of progression, but she was still kept on physical therapy for well over two more months. The physical therapist who wrote that weekly progress note rarely treated Patient A moving forward, and there was no evidence that that physical therapist was involved in writing the patient's subsequent physical therapy progress notes, which were written by a physical therapist assistant.

Sava continued to provide Patient A with enough therapy to qualify for Ultra High reimbursement and to bill Medicare at the RU level for 90 days of Patient A's 100-day stay. Sava kept Patient A on therapy for over two months longer than was reasonable and necessary.

(CC ¶¶ 176-179).

Patient A also received group therapy throughout her stay, and, while her plan of care indicated group therapy as a treatment, the weekly physical therapy, occupational therapy, and speech-language pathology progress notes did not support her participation in group therapy. Without those minutes for group therapy, Patient A's total minutes would not have reached the Ultra High level during any assessment period, other than her 90-day initial assessment period.

### Patient B

Patient B is a 56-year-old female who was admitted to Sava's Cambridge North facility in Michigan in March 2011 following a hospital admission for acute psychosis. She received physical and occupational therapy:

> Patient B's physical therapy goals were constantly increased during her stay. For example, one goal was ultimately updated to going up and down 16 steps, even though the patient had only four or five steps at home and planned to discharge to a group home. As the goals increased, the exercises were repetitive in nature and did not require the unique skills of a physical therapist. Similarly, Sava's occupational therapist continued to provide Patient B with occupational therapy, even once the exercises became repetitive in nature and Patient B no longer required daily skilled occupational therapy.
>
> Sava continued to provide Patient B with enough therapy to qualify for Ultra High reimbursement and to bill Medicare at the RU level for 40 unnecessary days.

(CC ¶¶ 181-182).

### Patient C

Patient C, a 55-year-old female, was admitted to Sava's Windsor facility in North Carolina in March 2009 for a craniotomy and then readmitted following the procedure. She received physical and occupational therapy and speech-language pathology services:

> During her second admission, Patient C was kept on physical therapy 44 days after the physical therapist had documented that she was ambulating independently with

a rolling walker. By day 21 of Patient C's 65-day second admission, she had complained of "overdoing it" and was advised to limit ambulation to twice daily from her room to the dining room and build endurance to prevent setbacks from occurring. Despite this, the physical therapist continued to record gait training daily, and documented essentially the same exercises each time.

Sava continued to provide Patient C with enough therapy to qualify for Ultra High reimbursement and to bill Medicare at the RU level for 60 days of Patient C's 65-day second admission.

(CC ¶¶ 184-185).

### Patient D

Patient D, a 77-year-old male, was admitted to Sava's Poplar Living Center in Wyoming after being found lying on the floor of his home, confused and combative, with slurred speech. He received physical and occupational therapy and speech-language pathology services beginning in June 2010:

. . . . Sava billed Medicare at the Ultra High level for all 100 days of Patient D's stay.

During the first two-and-a-half months of the patient's stay, E-stim represented 37 percent of the total physical and occupational therapy minutes Sava provided to Patient D. Although E-stim was included in Patient D's plan of care, Patient D's medical record did not support the E-stim provided.

Physical therapy recorded E-stim nearly daily for Patient D, representing 43 percent of his total physical therapy minutes recorded. On a number of days, the minutes of E-stim provided by the physical therapist exceeded the time spent on physical therapy exercises. On three consecutive days, and on at least three additional days later in his stay, Patient D spent 30 minutes or less completing physical therapy exercises and 35 minutes receiving E-stim administered by the physical therapist. Patient D's medical record did not support the E-stim administered by the physical therapist.

Occupational therapy recorded E-stim nearly daily for Patient D, representing 29 percent of his total occupational therapy minutes recorded. The occupational therapist noted that the patient "appears to be tired as he falls asleep during E-stim" therapy and later noted that the patient was "unable to stay awake during" therapy. Patient D's medical record did not support the E-stim administered by the

occupational therapist.

During the five assessments periods, E-stim accounted for 195, 285, 315, 295, and 145 minutes, respectively, of Patient D's total therapy minutes. Without the minutes attributable to E-stim, the total minutes for this patient would not have reached the Ultra High level during any of the assessment periods.

(CC ¶¶ 187-191).

### *Patient E*

Patient E, a 55-year-old male, was admitted to Sava's Virginia Highlands facility in Wisconsin after the removal of a testicular mass. He received physical and occupational therapy. He also received group therapy throughout his stay. While the plan of care indicated group therapy as a treatment approach, the weekly physical and occupational therapy progress notes did not support his participation in group therapy as recorded by Sava. (CC at ¶ 198).

## D. Causes of Action

The Government brings three causes of action against all Defendants. Counts I and II are brought under the FCA and allege, respectively, false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(A), and false statements in violation of 31 U.S.C. § 3729(a)(1)(B). Count III, also against all Defendants, alleges a common law claim for unjust enrichment. Finally, in Count IV, the Government alleges payment by mistake as to all Defendants, except SSC Submaster Holdings, LLC.

## II. Applicable Standards of Review

Two standards of review govern this Court's consideration of the alleged false statements and Defendants' Motion to Dismiss the same. First, under Rule 12(b)(6), "all well-pleaded material allegations of the pleadings" are accepted as true, and those allegations must "be sufficient to give notice to the defendant as to what claims are alleged, and . . . plead 'sufficient factual matter' to

render the legal claim plausible, i.e., more than merely possible." Fritz v. Charter Twp of Comstock, 592 F.3d 718, 722 (6th Cir. 2010) (quoting Ashcroft v. Iqbal, 129 S. Ct., 1937, 1949–50 (2009)). That is, under the general pleading standards of Rule 8, the factual allegations in the complaint need not be detailed, although "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

Second, "[t]he heightened pleading standard set forth in Rule 9(b) applies to complaints brought under the FCA." Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 563 (6th Cir. 2003). Under that rule, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity" while "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). To comply with Rule 9(b), "a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" United States *ex rel.* Bledsoe v. Cmty. Health Sys., Inc., 501 F.3d 493, 504 (6th Cir. 2007) (quoting Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)).

### III.  Application of Law

The four Defendants have filed three separate Motion to Dismiss the Consolidated Complaint, and all Defendants have collectively filed a Motion to Dismiss the Complaints of Plaintiffs Haywood and Kukoyi. Because the arguments advanced in favor and against the Motion to Dismiss filed by Defendants SavaSeniorCare Administrative Services and SavaSeniorCare Consulting LLC's in their Motion to Dismiss are, to a greater or lesser extent, relied upon by the parties for purposes of the other Motions to Dismiss, the Court begins there.

**A. SavaSeniorCare Administrative Services and SavaSeniorCare Consulting's ("SAS's") Motion to Dismiss (Docket No. 115)**

SAS argues that, notwithstanding a four year investigation, examination of over 150,000 documents and emails, and the taking of multiple depositions, the Government's FCA allegations fail for three independent reasons:  the Consolidated Complaint fails to (1) allege a violation of the governing legal standard; (2) plead with particularity examples of actual false claims; and/or (3) allege an objectively false claim.  The Court is unpersuaded by any of these arguments.

**1.  Governing Legal Standard**

Congress has set forth requirements for assuring the quality of care in SNFs.  These are found in 42 U.S.C. § 1395i-3(b)(4)(A), which, so far as relevant, provides that SNF "must provide nursing services and specialized rehabilitative services to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident[.]"  Similarly, the regulation on which SAS relies provides that "[e]ach resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychological well-being, in accordance with the comprehensive assessment and plan of care."  42 C.F.R. § 483.25.

Characterizing the requirement that a patient receive such care as the "HPL Mandate," SAS insists that the Government's failure to acknowledge – let alone consider – this requirement is fatal to the Consolidated Complaint.  It argues in relation to Patient B:

> The Government complains that Patient B's therapy goals were "constantly increased during her stay" at the SNF.  (Id. ¶ 181).  As its sole example, however, the Complaint alleges that a goal "was ultimately updated to going up and down 16 steps, even though [Patient B] had only four or five steps at home and planned to discharge to a group home."  (Id.)  Therefore, in the Government's estimation, Patient B had no right to treatment beyond what was needed to climb four or five steps at her home.  Such *de facto* rationing of health care using the FCA is the exact

opposite of what Congress required by enacting the HPL Mandate. If Patient B's highest practicable level was being able to climb sixteen steps, Patient B was statutorily entitled to receive, and the SNF was statutorily mandated to provide, the therapy necessary to reach that goal and maintain it. The Complaint contains no allegation that the sixteen-step goal was unattainable.

(Docket No. 116 at 11).

On its face, SAS's argument contains a fatal factual assumption – Patient B's highest practicable level was to climb 16 steps, and, therefore, there could be no fraud. This, of course, presupposes that this was a legitimate goal for Patient B, yet it is not incumbent on the Government at this point to prove what Patent B could or could not reasonably do.

There may be an even more fundamental problem with SAS's argument. "The False Claims Act is not a vehicle to police technical compliance with complex federal regulations," and, therefore, "conditions of participation, which are 'the requirements providers must meet to participate in the Medicare program'" do "not lead to False Claims Act liability." United States ex rel. Williams v. Renal Care Grp., Inc., 696 F.3d 518, 532 (6th Cir. 2012)). "Conditions of participation, as well as a provider's certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program." United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc., 543 F.3d 1211, 1220 (10th Cir. 2008). The statute and regulation on which SAS relies to support its "HPL mandate" appear to be directed towards participation.[9]

---

[9] In its reply brief, Sava argues that "directly contrary to its position here, the Government recently characterized the statutes and regulations imposing and implementing the HPL Mandate as 'essential' payment requirements constituting the 'heart of the . . . bargain' between the Government and a SNF." (Docket No. 147 at 3). While the Government did use such language in a written argument before the United States Court of Appeals for the Seventh Circuit, it preceded that language with the observation that the HPL mandate "and its implementing regulations identify a set of essential nursing services that nursing homes must provide *in order to participate* in the Medicare and Medicaid programs." (Id. at 3-4) (emphasis added) (citation omitted). Thus, it does not appear that the Government is taking directly contrary positions.

Regardless, "[m]edicare coverage is limited to services that are medically 'reasonable and necessary.'" United States v. Popov, 742 F.3d 911, 912-13 (9th Cir. 2014) (citation omitted); see Detroit Receiving Hosp. & Univ. Health Ctr. v. Sebelius, 575 F.3d 609, 611 (6th Cir. 2009) ("Under both Part A and Part B, Medicare pays for services that are medically reasonable and necessary for the beneficiary."); Hays v. Sebelius, 589 F.3d 1279, 1283 (D.C. Cir. 2009) ("items or services . . . must be reasonable and necessary to qualify for Medicare coverage."). This is what both the statutes and regulations say in relation to paying claims. See e.g., 42 U.S.C. § 1395y(a)(1)(A) (proscribing payment under Medicare Part A or Part B unless items or services are "reasonable and necessary"); 42 C.F.R. 411.15k (disallowing payment for certain types of services, test, and examinations that are not "reasonable and necessary"). And that is what the Government was required to plead. See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir. 1997) (affirming dismissal where plaintiff "failed to meet the pleading requirements of Rule 9(b) because he did not identify any specific physicians who referred patients for medically unnecessary services or any specific claims for medically unnecessary services that were submitted by defendants"); Frazier ex rel. United States v. Iasis Healthcare Corp., 392 F. App'x 535, 537 (9th Cir. 2010) (stating that to meet requirement of Rule 9(b), plaintiff must "at a minimum" provide a 'reliable indicia' that defendant submitted claims for medically unnecessary procedures"); Foglia v. Renal Ventures Management, LLC, 2015 WL 1104425, at *6 (D.N.J. Mar. 11, 2015) (requiring the filing of an amended complaint where "relator ha[d] not pled any facts that could show the actual amounts of [drugs] administered to patients were not reasonable and necessary"); United States ex rel. Frazier v. IASIS Healthcare Corp., 812 F. Supp. 2d 1008, 1017 (D. Ariz. 2011) (finding FCA claim insufficiently pled where plaintiff did "not plead facts showing

why the procedures performed on Patient B were unnecessary"); United States v. Caris Life Scis., Inc., 2013 WL 11579021, at *3 (N.D. Tex. Oct. 23, 2013) (citation omitted) (stating that to "successfully state a claim, the plaintiff must show that the defendant knew the treatment was unnecessary").

It is true that "[w]hat constitutes 'reasonable and necessary' services is not defined in the statute." United States v. Aegis Therapies, Inc., 2015 WL 1541491, at *6 (S.D. Ga. Mar. 31, 2015). SAS points to guidance from the Office of Inspector General of the Department of Health and Human Services that, in its view, "explain[s] that a SNF's compliance with the 'reasonable and necessary' payment standard can only be determined in light of the HPL Mandate":

> Billing for medically unnecessary services, supplies and equipment involves seeking reimbursement for a service that is not warranted by a resident's documented medical condition. See 42 U.S.C. 1395y(a)(1)(A) . . . . At the same time, nursing facilities are required to provide the services necessary to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident. See 42 U.S.C. 1395i-3(b)(2) . . . .

(Docket No. 147 at 4, quoting Compliance Program Guidance for SNFs, 65 Fed. Reg. 14,289, 14,295 n.44 (Mar. 16, 2000)).

To say that a SNF is required to provide and maintain the highest practicable level of care, and that reasonableness and necessity can only be determined by considering this benchmark, does not mean that failure to allege or even acknowledge the "HPL mandate" makes a Medicare FCA claim deficient. Sava points to no case authority to support this conclusion and the Court has found none, or even any case that references the "HPL mandate" as such.[10] The most that can be said is that Defendants may be able to prove that what they did was provide the type of care contemplated

---

[10] There are a handful of cases that discuss the Nursing Home Reform Act, 42 U.S.C. § 1396r, *et seq.* of which the HPL mandate is said to be a part. However, the Court does not read any of those cases as suggesting that anything beyond "reasonable and necessary" must be pled in a FCA case alleging improper submissions to Medicare.

(or in Defendants' view mandated) by Medicare and, as such, the care was reasonable and necessary.[11]

## 2. Particularity of Specific False Claims

SAS next argues that "[a]lthough the Complaint dedicates page after page to portraying an alleged corporate 'scheme' to pressure therapists to provide more therapy without regard to patient needs, the Complaint fails to state a claim because it does not adequately allege actual false claims arising out of that alleged scheme." (Docket No. 116 at 12). It points out that the Government has not alleged that: (1) "any of the claimed services to the focus patients was not provided"; (2) "the focus patients did not need at least some skilled rehabilitation in a SNF"; (3) "the therapy was not provided by qualified therapists"; (4) "a physician did not approve the therapy provided to each of the focus patients"; (5) "anyone lied to or withheld critical information from the patients, therapists or physicians"; (6) "any of the individual therapists providing services to the focus patients did not believe that the services were reasonable and necessary to help patients reach their 'highest practicable' level of function"; or (7) "corporate pressure or any specific emails reflecting corporate pressure actually resulted in unnecessary therapy received by any of the focus patients." (Id. at 13). SAS then presents a 10-page chart that, in one column sets forth the allegations for each of the 5 specific patients and, in the next column, dissects those allegations (sometimes line by line) in an effort to show why they do not state a claim. SAS's effort is worthy of acknowledgment, but ultimately unavailing for a couple of reasons.

First, "'Rule 9(b)'s particularity requirement does not mute the general principles set out

---

[11] Defendants' professed concern about imposing "crippling FCA liability for services consistent with Medicare's HPL mandate . . . chill[ing] the provision of services and depriv[ing] Medicare beneficiaries of their statutory right to therapy" is, therefore, premature.

in Rule 8; rather the two rules must be read in harmony.'" Sanderson v. HCA-The HealthCare Co., 447 F.3d 873, 876 (6th Cir. 2006) (quoting Michaels Bldg. Co. v. Ameritrust Co. NA,848 F.2d 674, 679 (6th Cir. 1988)). That is, "[a]lthough Rule 9(b)'s special pleading standard is undoubtedly more demanding than the liberal notice pleading standard which governs most cases," its "special requirements should not be read as a mere formalism, decoupled from the general rule that a pleading must only be so detailed as is necessary to provide a defendant with sufficient notice to defend against the pleading's claims." United States ex rel. SNAPP, Inc. v. Ford Motor Co., 532 F.3d 496, 503 (6th Cir. 2008). Thus, while "pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b)," where, as here, the Government "pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, [the Government] may proceed to discovery on the entire fraudulent scheme." Bledsoe, 501 F.3d at 510.

Second, "[i]n this Circuit, there is '[a] clear and unequivocal requirement that a relator allege specific false claims' when pleading a violation of the FCA," United States ex rel. Sheldon v. Kettering Health Network, 816 F.3d 399, 411 (6th Cir. 2016) (citation omitted), and this includes "a strict requirement that [the Government] identify actual false claims," Chesbrough v. VPA, P.C., 655 F.3d 461, 472 (6th Cir. 2011). Nevertheless "[a] complaint sufficiently pleads the time, place, and content of the alleged misrepresentation so long as it 'ensure[s] that [the] defendant possesses sufficient information to respond to an allegation of fraud; providing the defendant with sufficient information to respond is Rule 9's 'overarching purpose.'" Sheldon, 816 F.3d at 411.

Leaving aside for the moment the specific allegations regarding each of the five patients discussed in the body of the Consolidated Complaint, that document attaches and incorporates by

reference a chart that list twenty alleged false claims: four each for Patients A, B, and D; five for Patient C; and three for Patient E. Each of the claims are identified by patient,[12] the Sava facility where the services were performed, the Medicare Claim number, the dates of service, the date when the claim was received, and the date the claim was paid. These alone show the time and place of the alleged fraud and, at least by inference, the content of the alleged misrepresentation given the overriding theme of the Complaint that the therapy Defendants provided was not reasonable and necessary and/or not skilled.

Further, the specific allegations regarding each of the five patients suggest why the billings were allegedly false and at least render plausible the Government's overriding allegations that Defendants billed for therapy that was excessive or unnecessary, and pushed the use of modalities that were unnecessary, and billed for unreasonable or unnecessary group therapy. By way of example, while the progress notes for Patient A indicated that she was to be discharged soon due to lack of progression, she was kept on therapy for two more months; Patient B was provided with occupational therapy, even though it became repetitive in nature and were no longer required; Patient C was kept on physical therapy 44 days after her therapist had documented that she was ambulating independently with a walker; 43 percent of Patient D's physical therapy was attributed to E-stim, even though the medical record did not support that amount; and both Patients A and E received group therapy that was not supported by their progress notes.

In its reply brief, SAS challenges each of the Government's assertions that the Consolidated Complaint is sufficient to show false statement in regard to each patient. For example, it claims the

_____

[12] Because it is a public document, the Consolidated Complaint identified the Patients simply as "A" through "E". Contemporaneously with the filing of the Complaint, however, the Government provided Defendants with the actual identities of each of these patient.

allegation that Patient A was unnecessarily kept on physical therapy for two extra months based on a therapist's progress notes "ignores the Complaint's very next factual allegation" that the therapist who wrote the progress note "rarely treated Patient A moving forward," thus "undermining the Government's argument." (Docket No. 147 at 6). SAS also contends the Government's argument with respect to Patient B "rests on the legal fallacy that Patient B was not entitled to therapy to maximize her abilities" by climbing 16 steps, and that the mere fact that Patient C "was using a rolling walker does not mean or even imply that additional physical therapy is unreasonable or necessary." (Id.). SAS argues similarly that the allegation that Patient D's medical record did not support the amount of E-stim he received ignores the fact that "there is no statute or regulation that limits Medicare coverage to E-stim to any percentage of total therapy minutes." (Id. at 6-7).

These arguments as well as the others raised by SAS may be accepted by the factfinder, but the question now is not whether the Government is ultimately correct in its assertions. "So long as [the Government] pleads sufficient detail – in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud – to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." Snapp, 532 F.3d at 504. The Government has done so in this case.

### 3. Objectively False

Finally, SAS argues that the Complaint fails to allege an objectively false claim because the purported falsities are based on no more than clinical disagreements. It goes on to assert that "the objective-falsity principle is of profound significance in the Medicare context, where individuals providing health care must exercise clinical judgment on a daily basis." (Docket No. 116 at 25). In fact, according to SAS, the CMS has promulgated "a regulation stating that, with respect to treatment provided by SNFs, '[c]linical disagreement does not constitute a material and false

statement.'" (Id. quoting 42 C.F.R. ¶ 483.20(j)(2)).

Many cases hold that objective falsity is a prerequisite to FCA liability, albeit, more often than not in the context of what must be proven, not pled.[13] See e.g., United States ex rel. Yannacopoulos v. Gen'l Dynamics, 652 F.3d 818, 836 (7th Cir. 2011) (affirming summary judgment and indicating that "a statement may be deemed 'false' for purposes of the False Claims Act only if the statement represents an objective falsehood"); Hamilton Cnty. Emergency Commc'ns Dist. v. BellSouth Telecommunications, LLC, 154 F. Supp. 3d 666, 697 (E.D. Tenn. 2016) (stating in context of motion for summary judgment that "alleged false claim must contain an 'objective falsehood' that the Defendant knew was false"); United States v. Northrop Grumman Sys. Corp., 2015 WL 5916871, at *11 (N.D. Ill. Oct. 8, 2015) (granting summary judgment where "[a] jury could not find that [defendant] made an objective falsehood"); United States ex rel. Roby v. Boeing Co., 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) (court observing in context of cross motions for summary judgment that "[a]t a minimum, the FCA requires proof of an objective falsehood"). Under this approach "expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false," Roby, 100 F. Supp. 2d at, 625, or, put differently, "a mere difference of opinion, without more, is not enough to show falsity[.]" Asercare, 153 F. Supp.3d at 1381). [14]

On the other hand, it has been held that "proof of an objective falsehood is not the only means of establishing an FCA claim" because, in enacting the FCA, "Congress wrote expansively,

---

[13] Indeed, United States v. Asercare, Inc., 153 F. Supp.3d 1372 (N.D. Ala. 2015), on which SAS relies for the proposition that a "difference of opinion" on the question of medical necessity is not enough, was decided in the context of a motion for a new trial.

[14] Presumably, even under the objectively false standard a claim can be false, notwithstanding a clinician's prescription. For example, a clinician who prescribes therapy because he or she has mandated goals and not because it is in the patient's best interest is not prescribing objectively reasonable or necessary care.

meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" United States v. Robinson, 2015 WL 1479396, at *5 (E.D. Ky. Mar. 31, 2015).[15] Thus, "[w]hile FCA liability must be based on an objectively verifiable fact . . ., facts that rely upon clinical judgment are not automatically excluded from liability under the FCA." United States ex rel. Landis v. Hospice Care of Kansas, LLC, 2010 WL 5067614, at *4 (D. Kan. Dec. 7, 2010); see, United States ex rel. Morton v. A Plus Benefits, Inc., 139 F. App'x 980, 983 (10th Cir. 2005) (stating that "liability under the FCA must be predicated on an objectively verifiable fact," but also stating the court was "not prepared to conclude that in all instances, merely because the verification of a fact relies upon clinical medical judgments . . . the fact cannot form the basis of an FCA claim").

Again, however, the Court's present concern is not what must be proven, but rather what must be pled. "To plead fraud with particularity, the plaintiff must allege (1) 'the time, place, and content of the alleged misrepresentation,' (2) 'the fraudulent scheme,' (3) the defendant's fraudulent intent, and (4) the resulting injury." Chesbrough, 655 F.3d at 467 (quoting Bledsoe, 501 F.3d at 504). As in United States ex rel. Martin v. Live Care Centers of America, Inc., 1:8-cv-00251, Docket No. 106 (E.D. Tenn. Nov. 28, 2012), the Court finds the allegation sufficient as to all these elements.

In Life Care, the Government sued Life Care which, like present Defendants, operated a chain of SNF, and which, like here, allegedly provided unreasonable and unnecessary rehabilitation therapy services to increase its profits by billing more patients to Medicare at the Ultra High RUG level. Life Care moved to dismiss, arguing, among other things, that the Complaint was insufficient

---

[15] The court in Robinson went on to hold that "even if the question of whether Dr. Robinson's services were necessary involves some measure of a subjective determination on his part, if the United States can show that Dr. Robinson violated his 'continuing duty to comply with the regulations on which payment is conditioned,'. . . or that he engaged in 'upcoding' his services, . . such falsity is sufficient for an FCA claim." Id. (citation omitted).

because it failed "to plead 'the requisite elements of a false claim,'" and, more specifically, "fail[ed] to allege an 'objectively false' claim." Id. at 14. Finding the complaint sufficient, the United States District Court for the Eastern District of Tennessee wrote:

> The Court agrees with Defendant that a determination of what services are medically necessary and reasonable must be made by a physician qualified to make those determinations. However, the Medicare requirement that a physician certify services performed does not insulate Defendant from liability resulting from noncompliance with Medicare regulations. The Complaint contains many allegations regarding Defendant's actions to influence and direct its therapists, including setting corporate targets at the Ultra High RUG level, pushing for increased Medicare revenue, setting minimum therapy levels, measuring an employee's performance on his ability to bill at an Ultra High RUG level, and rewarding employees who billed at higher RUG levels. The Complaint alleges that these actions, directing and pressuring therapists to bill at higher RUG levels, resulted in Life Care submitting Medicare billings which were knowingly false. Further, for these allegations, the Complaint provides numerous examples of specific managerial employees who directed these actions and specific Life Care divisions in which these actions took place. Although the parties may dispute how the Medicare regulations should be interpreted, the Complaint itself provides sufficient detail regarding how Life Care allegedly effected FCA violations to survive Defendant's Motion to Dismiss.

Id. at 19-20 (internal citations omitted).

SAS's efforts to distinguish Life Care are unavailing. It argues:

> The Life Care complaint alleged that ten specific patients were subjected to high levels of therapy even though the patients' "clinical characteristics and physical condition indicated that they could not be reasonably expected to participate in, much less benefit from, those levels of intensive therapy." . . . As just one example, the Life Care complaint described a 92-year-old patient dying of cancer that had spread to his brain and lungs who received massive amounts of therapy up to and including the day of his death even though he was growing weaker due to palliative radiation treatment and was spitting up blood.

(Docket No. 147 at 9). True, the allegations regarding the 92-year-old patient in Life Care (identified as Patient D in that case) are more alarming than any of the ones here, but the essence of the claims are the same. And, while the Consolidated Complaint in this action may not reference the "clinical characteristics" or allege the Patients could not reasonably be expected to participate

in certain activities, it does allege that "[i]n many instances, Sava imposed therapy services on its patients that did not take into account – or were contrary to – their clinical needs," and that "Sava routinely failed to provide support for the reasonableness and necessity of the skilled therapy services provided to patients," (CC ¶¶ 172, 173), along with a slew of other allegations suggesting the filing of false claims.

## B. SavaSeniorCare LLC's ("SeniorCare's") Motion to Dismiss (Docket No. 115)

In addition to the reasons advanced by SAS, Defendant SeniorCare moves to dismiss on the grounds that it is barely mentioned in the Consolidated Complaint and "[f]ew averments directly referenc[e] any actions allegedly taken by, or attributable to" SeniorCare. (Docket No. 114 at 2). "Furthermore," SeniorCare argues, "the Government's Complaint fails to satisfy Rule 9(b)'s heightened pleading requirements because it indiscriminately groups all of the individual defendants into one wrongdoing monolith." (Id. at 3).

It is true, as SeniorCare correctly observes, that "[b]eing a parent corporation of a subsidiary that commits a FCA violation, without some degree of participation by the parent . . . is not enough to support a claim against the parent for the subsidiary's FCA violation[.]" United States ex rel. Tillson v. Lockheed Martin Energy Sys., Inc., 2004 WL 2403114, at *33 (W.D. Ky. Sept.30, 2004); accord United States ex rel. Holbrook v. Brink's Co., 2015 WL 196424, at *25 (S.D. Ohio Jan. 15, 2015) (collecting cases). It is also true that "Rule 9(b)'s heightened pleading requirements require a plaintiff who pleads fraud to identify the speaker of the statement," and that "referring vaguely only to 'defendants' of which there are many" does not suffice. Cataldo v. United States Steel Corp., 676 F.3d 542, 551-52 (6th Cir. 2012).

While the specific allegations against SeniorCare are sparse, the Court finds them sufficient to allow discovery. A fair reading of the Consolidated Complaint suggests that the Defendants,

acting in concert, created and implemented policies in an effort to wrongfully enlarge Medicare billing. Aside from alleging that SeniorCare "sits atop the corporate structure," and, through its subsidiary owned and managed the 185 or so SNFs at issue in this case, the Consolidated Complaint also alleges that Medicare payments were swept into one centralized account and there was a complex and changing structure with certain high-level employees moving among the subsidiaries. See United States *ex rel*. Carter v. Halliburton Co., 2009 WL 2240331, at *16 (E.D. Va. July 23, 2009 (finding "from the allegations that Relator is claiming that all three of the Defendants that wish to be dismissed 'undertook the actions described,'" and holding that "[i]t is premature, at this stage of this litigation, for the Court to determine from which of the entities with convoluted and changing corporate structures the Government and Relator may be entitled to recover").

**C. SSC Submaster Holding's ("Submaster's") Motion to Dismiss (Docket No. 111)**

In addition to incorporating the arguments made by SAS and SeniorCare, Defendant Submaster argues for dismissal on the grounds that the Consolidated Complaint itself states that SeniorCare ceased to exist in 2010. Therefore, "the *only* false claim alleged by the Government during the period of Submaster's alleged involvement pertains to Patient C" and because "the Government's allegations fail as to Patient C," the Consolidated Complaint should be dismissed for failure to state a claim. (Docket No. 112 at 3, emphasis in original). This argument fails because the Court has found the claims relating to the referenced patients, including Patient C, sufficient.

**D. Defendants' Motions to Dismiss Relators' Complaints (Docket Nos. 118 & 125)**

Defendants have collectively moved to dismiss Relators Hayward's and Kukoyi's First Amended Complaints. With regard to the former, the parties have entered into a Joint Stipulation, the upshot of which is that the motion as to Hayward should be denied as moot given certain

concessions by her.

The record reflects no such stipulation as to Relator Kukoyi's Complaint. It does, however, reflect that, prior to the filing of the Motion to Dismiss, he voluntarily dismissed certain claims and, after the motion was briefed, filed a Consent Motion to have his retaliation claim severed and stayed. As the Court understands the record then, Relator Kukoyi's claims on which the Government intervened remain pending, along with other Medicare, Medicaid and state law claims.

The law regarding the effect of the Government's intervention on a relator's complaint is unsettled. As Defendants recognize, some courts have held that "[o]nce the Government has intervened, the relator has no separate free-standing FCA cause of action." In re Pharm. Indus. Average Wholesale Price Litigation, 2007 WL 4287572 (D. Mass. Dec. 6, 2007). Other courts have held that the Government's complaint in intervention "becomes the operative complaint as to all claims in which the government has intervened." United States ex rel. Sansbury v. LB & B Assoc. Inc., 58 F. Supp. 3d 37, 47 (D.D.C. 2014). Nevertheless, it does not automatically follow that the intervened claims must be dismissed.

The FCA provides that, "[i]f the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action." 31 U.S.C. § 3730(c)(1). However,

> The statute does not indicate that a relator does not retain standing after the government intervenes. In fact, the statute provides for the opposite, stating: "If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action ." . . . [B]y automatic operation of the statute, the Government's complaint in intervention becomes the operative complaint as to all claims in which the government has intervened. . . . However, a relator's initial complaint continues to be the operative complaint for all non-intervened claims and relators remain a party to the Government's intervened claims[.]

Sansbury, 58 F. Supp. 3d at 47 (D.D.C. 2014) (internal citations omitted).  Thus, "[a]lthough courts often dismiss superseded claims, dismissal is not required where defendants make 'no showing that the Relators' participation during the course of the litigation will cause them undue burden or expense that would justify limiting their participation.'"  United States ex rel. Fowler v. Evercare Hospice, Inc.,  2015 WL 5568614, at *12 (D. Colo. Sept. 21, 2015) (quoting Id.)

Here, Defendants assert that they "would face undue burdens and expense if they had to litigate four different sets of FCA claims based on different theories of false-claims liability." (Docket No. 126 at 6).  This is a bit disingenuous since the parties agree the Consolidated Complaint is controlling, Scott's claims have gone by the wayside, and Hayward's claims are effectively on hold.

Simply put, the Court will not dismiss Kukoyi's First Amended Complaint merely because the Government has intervened.  And, because the Government's Complaint is controlling, Defendants' arguments as to the sufficiency of the intervened claims are moot.[16]  See United States ex rel. Dresser v. Qualium Corp., 2016 WL 3880763, at *10 (N.D. Cal. July 18, 2016) ("as for the sufficiency of [relator's] allegations on the intervened claims, Defendants' arguments are moot because the United States' allegations, not [relator's] allegations, control as to the intervened claims").

As for the non-intervened FCA claims,[17] Defendants spend 5½ pages attacking the 150-page, 568 paragraph First Amended Complaint.  To be fair,  Kukoyi's Complaint contains a large amount of excess verbiage.  Further, the caption alone runs more than 9 pages, and 184 paragraphs and

---

[16] This includes not only the sufficiency of the allegations under Rules 8 and 9, but also Defendants' objection to the grouping into a monolith.

[17] Defendants seek dismissal of the state law claims for the same reasons advance with respect to the FCA claims because the same heightened pleading standards apply to both sets of claims.

32pages are spent just on identifying the parties. Still, Defendants seek dismissal of the entire Complaint, yet do not discuss Kukoyi's allegations regarding Medicaid as opposed to Medicare fraud. And, on the Medicare claims that are not intervened, Defendants argue for dismissal using very broad strokes.

Defendants claim that "[d]ismissal is appropriate because, even as to the one SNF where she was employed, Kukoyi fails to plead with particularity 'the who, what, when, where, and how of the alleged fraud.'" (Docket No. 126 at 11) (citation and emphasis omitted). They argue instead that, with respect to Windwood Lakes, Kukoyi relies entirely on "conclusory allegations," including:

> [Woodwind Lakes' administrator] routinely adds documentation to patients' records in order to justify the continued billing to Medicare for unnecessary skilled nursing care services. FAC ¶ 310.

> Staff at Woodwind Lakes routinely use the RUX rate for patients who no longer qualify for skilled nursing care. FAC ¶ 320.

> During Relator's three months of employment with Sava, she observed that Sava nurses were filling out the Minimum Data Set in such a way as to exaggerate the severity of the patients' health condition upon admission, which resulted in inflated RUG rates. FAC ¶ 335.

Defendants then argue that "Kukoyi provides no concrete examples to buttress her general and conclusory allegations of fraud." (Id.).

The above-paragraphs that Defendants cite are incomplete, and, both before and after those paragraphs, the allegations are somewhat fleshed out. The "Woodwind Lakes' administrator" is identified as Kukoyi's supervisor Angela McArthur who, she claims, instructed Kukoyi on her first day of work to add notes to patients' charts so that they would continue to qualify for skilled nursing care under Medicare Part A. She also claims that other staff members were likewise instructed to supplement patient charts by adding fictitious conditions in order to keep Medicare reimbursements up, and to fill out documents in such a way that the highest reimbursement rates would apply.

Kukoyi also alleges that, as a licensed social worker, she was required to fill out certain portions of the MDS sheets and her review of those sheets indicated that they often did not reflect the patients' condition or treatment. Far from simple conclusions, Plaintiff alleges that she witnessed firsthand, and was forced to participate in, improprieties directed at obtaining improper reimbursements.

Defendants next argue that Relator "does not identify any individual patients, much less any medically unnecessary services" and that the "closest Kukoyi ever comes to pleading an actual patient example is in Paragraph 325 of her FAC, where she alleges that she 'knows of two elderly male patients who were continually billed under Medicare Part A but did not receive the services for which Medicare was billed.'" (Id. at 11-12). However, in that same paragraph, Relator states those patients "were unable to get out of their bed to receive such services" and that she knows and can supply the names of the two patients. See, United States *ex rel.* Hill v. Morehouse Med. Assoc., 2003 WL 22019936, at *5 (11 Cir. 2003) (finding FCA claim sufficiently plead even though plaintiff could not provide patient names or exact dates on which allegedly false claims were submitted); United States *ex rel.* Bonin v. Cmty. Care Ctr. of St. Martinville, LLC, 2008 WL 2597943, at *1 (W.D. La. June 26, 2008) (holding that plaintiff "need not allege in the complaint, prior to discovery, every possible detail concerning the falsified documents – *e.g.*, 'exact patient names' – in order to meet the requirements of Rule 9(b)").

Defendants also argue that Kukoyi's failure to plead particular examples of fraud "is especially telling in light of the contradictory, speculative, and implausible nature of Kukoyi's general allegations." (Docket No. 126 at 13). Defendants continue: "Taking as true Kuyoki's allegations, these allegations are entirely consistent with legal conduct." (Id.). The rejoinder is simple: an Administrator – with no medical degree – who adds false things to medical charts in order to drum-up Medicare reimbursement, and instructs others to do the same is not engaging in legal

conduct.

Given the scope of Defendants' request (dismissal of all claims), the brevity and wide sweep of their arguments, and their failure to acknowledge certain allegations, the Court finds it unnecessary to go any further, other than to make three general observations. First, "[t]he purpose undergirding the particularity requirement of Rule 9(b) is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." Michaels Bldg. Co. v. Ameritrust Co., 848 F.2d 674, 679 (6th Cir. 1988). Second, "a relator need not plead 'every specific instance of fraud where [her] allegations encompass many allegedly false claims over a substantial period of time.'" United States ex rel. Meyer v. Kempf Surgical Appliances, Inc., 2013 WL 1438025, at *3 (S.D. Ohio Apr. 9, 2013) (citing Bledsoe, 501 F.3d at 509). Third, the Sixth Circuit continues to "'leave open' the possibility that Rule 9(b)'s requirements may be relaxed in situations in which the plaintiff 'has pled facts which support a strong inference that a claim was submitted,' either on the basis of 'personal knowledge' or otherwise." United States ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC, 642 F. App'x 547, 553 (6th Cir. 2016) (quoting Chesbrough, 655 F.3d at 470-71).

## IV.  Conclusion

Defendants correctly observe that "[g]ranting a motion to dismiss after the Government files a complaint in intervention is unusual." (Docket No. 147 at 9). Contrary to Defendants' belief, however, the Consolidated Complaint sets forth sufficient factual averments to suggest the claims are plausible, and pleads the alleged false statements with particularity. Accordingly, the Motions to Dismiss the Consolidated Complaint will be denied.

The Motion to Dismiss Relator Kukoyi's Complaint will be denied because the Court has

not been persuaded that it fails to state a claim on which relief can be granted, or that the allegations of fraud are insufficiently pled. The Motion to Dismiss Relator Hayward's Complaint will be denied as moot in accordance with the parties' stipulation. However, those Relators' Motions to Sever and Stay their retaliation claims will be granted.

Finally, Defendants request oral arguments on their Motions to Dismiss the Consolidated Complaint. Those requests will be denied. The pleading standards relating to FCA claims are clear, the Consolidated Complaint succeeds or fails on its own terms, and the parties have thoroughly argued their positions.

An appropriate Order will enter.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE